No. 17-1548

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

STEPHEN N. SIX; DARREN TODD KAPLAN; JOHN AUSTIN MOORE; STUEVE SIEGEL HANSON LLP; AND THE DARREN KAPLAN LAW FIRM, P.C.,

*Appellants,*

v.

GENERATIONS COMMUNITY FEDERAL CREDIT UNION,

*Appellee.*

---

On Appeal from the United States District Court
for the Middle District of North Carolina
(Civ. No. 13-897)  (The Honorable Catherine C. Eagles, J.)

---

## BRIEF OF LAW PROFESSORS AS *AMICI CURIAE*
## IN SUPPORT OF APPELLANTS

---

David C. Frederick
Minsuk Han
Jacob E. Hartman
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (facsimile)
dfrederick@kellogghansen.com

*Counsel for Law Professors as Amici Curiae*

July 19, 2017

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF INTEREST OF *AMICI CURIAE*  ...............................................1

SUMMARY OF ARGUMENT ................................................................1

ARGUMENT ................................................................................3

I.    AUTHENTICATION OBJECTIONS ENSURE THAT A FACT IS
      SUPPORTED BY TRUSTWORTHY EVIDENCE .......................................3

      A.    The Proponent Of An Item Of Evidence Bears The Burden Of
            Authentication, And The Opposing Party May Raise Objections
            To The Proponent's Failure To Authenticate.......................................3

      B.    Courts Have Recognized The Heightened Importance Of
            Authentication For Computerized Records...........................................4

      C.    By Failing To Authenticate, The Proponent Multiplies
            Proceedings And Neglects The Court's Need For Trustworthy
            Evidence And Its Duty To Identify The Source And The
            Absence Of Alteration..........................................................5

      D.    The District Court Erred By Forcing The Objecting Party To
            Show Bases For Disputing Authenticity When The Proponent
            Presented No Proof Of Authenticity—In Direct Contradiction
            To The Burden Allocation Under The Federal Rules .........................7

II.   COUNSEL HAS NO DUTY TO DISCLOSE ANY EVIDENCE
      WHEN MAKING AUTHENTICATION OBJECTIONS ...........................10

      A.    Authentication Objections Concern Only Whether The
            Proponent Made A *Prima Facie* Showing Of Authenticity, Not
            The Ultimate Authenticity Determination ..........................................10

      B.    The Disclosure Rule Imposed By The District Court Has No
            Basis And Will Flood The Court System With Prophylactically

i

Appended Evidence, Adversely Affecting Pretrial Motions Practice ...................................................................................11

III.   THE RULES IMPOSED BY THE DISTRICT COURT WILL CHILL ZEALOUS ADVOCACY AND UNDERMINE THE ADVERSARIAL SYSTEM ..........................................................14

  A.   The District Court Asks Advocates To Advance Their Adversaries' Case By Disclosing Unfavorable Evidence..................15

  B.   The District Court's Liberal Imposition Of Sanctions Discourages Zealous Advocacy ........................................17

  C.   The District Court's Sanction Rule Creates Conflict Between Counsels' Interests And Their Clients' ...............................21

IV.   THE RULES IMPOSED BY THE DISTRICT COURT WILL INVITE ABUSIVE AND FRIVOLOUS SANCTIONS MOTIONS THAT WILL FURTHER BURDEN THE COURTS ...................................24

CONCLUSION....................................................................28

APPENDIX: LIST OF AMICI CURIAE

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Baulch v. Johns*, 70 F.3d 813 (5th Cir. 1995) ......................................................9, 10

*Be-Lo Stores v. N.L.R.B.*, 126 F.3d 268 (4th Cir. 1997) ...................................... 4-5

*Colucci v. New York Times Co.*, 533 F. Supp. 1011 (S.D.N.Y. 1982) ...................21

*Dondi Prop. Corp. v. Commerce Sav. and Loan Ass'n*,
121 F.R.D. 284 (N.D. Tex. 1988)....................................................................26

*Fenje v. Feld,* 301 F. Supp. 2d 781 (N.D. Ill. 2003),
aff'd, 398 F.3d 620 (7th Cir. 2005) ............................................................7, 8

*Gaiardo v. Ethyl Corp.*, 835 F.2d 479 (3d Cir. 1987) ...........................................26

*Interstate Steel Setters, Inc. v. A.J. Maggio Co.*, *In re*,
65 B.R. 312 (Bankr. N.D. Ill. 1986) ..........................................................9, 10

*Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534 (D. Md. 2007) ........................4, 6

*Rambus, Inc. v. Infineon Techs. AG*, 348 F. Supp. 2d 698 (E.D. Va. 2004) ............4

*Schwartz v. I.R.S.*, 511 F.2d 1303 (D.C. Cir. 1975)...............................................13

*Taylor v. Principi*, 141 F. App'x. 705 (10th Cir. 2005) ...........................................3

*United States v. Branch*, 970 F.2d 1368 (4th Cir. 1992) ..........................................3

*United States v. Vidacak*, 553 F.3d 344 (4th Cir. 2009)........................................10

*Vee Vinhnee*, *In re*, 336 B.R. 437 (B.A.P. 9th Cir. 2005)........................................4

iii

**STATUTES**

Federal Rules of Appellate Procedure:

Fed. R. App. P. 29(a) ...................................................................1

Fed. R. App. P. 29(c)(5) .............................................................1

Federal Rules of Civil Procedure:

Fed. R. Civ. P. 11......................................................................26, 27

Fed. R. Civ. P. 12(b)(6) ................................................................13

Fed. R. Civ. P. 26(a) .....................................................................16

Fed. R. Civ. P. 36(a)(1)(B) ......................................................... 3-4, 5

Fed. R. Civ. P. 37(c)(2)(C) ......................................................... 5-6

Fed. R. Civ. P. 56(c)(2) ..................................................................3

Committee Notes on Amendments to Federal Rules of
    Civil Procedure, 146 F.R.D. 401 (1993) .......................................15, 16

Federal Rules of Evidence:

Fed. R. Evid. 104(b) ......................................................................3

Fed. R. Evid. 803(6) ......................................................................5

Fed. R. Evid. 901(a)...............................................................1, 3, 11

Fed. R. Evid. 902(11) ....................................................................5

**OTHER MATERIALS**

2 *Trial of Queen Caroline* 8
    (London, J. Robins & Co. Albion Press 1820-21) .................................. 18-19

Albert Alschuler, *The Search for Truth Continued, the Privilege Retained: A Response to Judge Frankel*, 54 U. Colo. L. Rev. 67 (1982) .................................................................17

Joe S. Cecil, et al., *Motions to Dismiss for Failure to State a Claim After Iqbal – Report to the Judicial Conference Advisory Comm. on Civil Rules*, Fed. Judicial Ctr. (2011)..........................................13

Greta Fails, *The Boundary Between Zealous Advocacy and Obstruction of Justice After Sarbanes-Oxley*, 68 N.Y.U. Ann. Surv. of Am. L. 397 (2012-2013) .................................. 23-24

*Final Report of the Comm. on Code of Prof'l Ethics*, 31 Annu. Rep. A.B.A. 567 (1908)......................................................... 17-18

Monroe H. Freedman, *Our Constitutionalized Adversary System*, 1 Chap. L. Rev. 57 (1998) ...........................................................14

Monroe H. Freedman, Understanding Lawyers' Ethics (1990) ................. 20-21, 24

Henry J. Friendly, *"Some Kind of Hearing"*, 123 U. Pa. L. Rev. 1267 (1975)...................................................19

Bruce A. Green, *Whose Rules of Prof'l Conduct Should Govern Lawyers in Fed. Court and How Should the Rules Be Created?,* 64 Geo. Wash. L. Rev. 460 (1995).......................... 22-23

Peter J. Henning, *Lawyers, Truth, and Honesty in Representing Clients*, 29 Notre Dame J.L. Ethics & Pub. Pol'y 209 (2006)....................................18

Lonny Hoffman, *Twombly and Iqbal's Measure: An Assessment of the Fed. Judicial Ctr.'s Study of Motions to Dismiss*, 6 Fed. Cts. L. Rev. 1 (2011) ..........................................................13

Byron C. Keeling, *A Prescription for Healing the Crisis in Professionalism: Shifting the Burden of Enforcing Prof'l Standards of Conduct*, 25 Tex. Tech L. Rev. 31 (1993) .............25, 26, 27, 28

Manual for Complex Litigation, Fourth, § 11.446 (2017) .........................................4

Model Rules of Prof'l Conduct, Preamble 2 (Am. Bar. Ass'n 2013).......................18

Stephen L. Pepper, *The Lawyer's Amoral Ethical Role:*
    *A Defense, A Problem, and Some Possibilities,*
    1986 Am. B. Found. Res. J. 613 (1986) .......................................................22

C. William Phillips, *The Law and Tactics of Sanctions,*
    87 C.P.S. A-87 (2007) ...............................................................................25

Philip Shuchman, *The Question of Lawyers' Deceit,*
    53 Conn. B.J. 101 (1979)............................................................................15

Gerald F. Uelmen, *Lord Brougham's Bromide: Good Lawyers*
    *as Bad Citizens,* 30 Loy. L. A. L. Rev. 119 (1996)........................... 17, 18-19

Weinstein's Federal Evidence § 901.02[1].......................................................3

Weinstein's Federal Evidence § 901.02[3]......................................................10

Fred C. Zacharias, *Reconciling Professionalism and Client Interests,*
    36 Wm. & Mary L. Rev. 1303 (1995)....................................................20, 23

vi

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are law professors who regularly teach and write about civil litigation and professional responsibility. *Amici* have no financial interest or involvement (except for this brief) in this or any other pending action raising the issues discussed here. Because the district court's ruling implicates fundamental issues of civil litigation and professional responsibility, *amici* believe that their perspective may assist the Court in resolving this case.[2]

## SUMMARY OF ARGUMENT

Under Federal Rule of Evidence 901(a), the proponent of an item of evidence bears the burden of authenticating that evidence before it may be considered by the factfinder. In this case, the district court turned that obligation on its head. Appellee made no efforts to authenticate the documentary evidence it presented to the court, and Appellants successfully objected to it. Yet Appellants were ultimately sanctioned by the court because they were in possession of

---

[1] A full list of *amici*, including their institutional affiliations, is set forth in the Appendix to this brief.

[2] Pursuant to Federal Rules of Appellate Procedure 29(a), *amici* state that a motion for leave is being filed concurrently with this brief. Pursuant to Federal Rules of Appellate Procedure 29(c)(5), *amici* state that no counsel for any party authored this brief in whole or in part, that no counsel or party other than *amici* and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

undisclosed evidence tending to support authenticity at the time they made the authentication objection.

The district court's ruling in this case is in direct contradiction to the burden allocation established by the Federal Rules and creates an affirmative disclosure duty that has no basis in case law, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, or the North Carolina Rules of Professional Conduct. Moreover, the district court's opinion and accompanying sanction, if permitted to stand, will adversely affect federal practice as it will burden courts, chill zealous advocacy, and encourage abusive and strategic sanctions motions practice.

For all these reasons, elaborated below, *amici* urge the Court to vacate the district court's judgment.[3]

---

[3] *Amici* also direct the Court to declarations submitted below by Professors Kathryn Webb Bradley (J.A. 723-743), Donald H. Beskind (J.A. 744-757), and Stephen A. Saltzburg (J.A. 758-774).

2

# ARGUMENT

## I.     AUTHENTICATION OBJECTIONS ENSURE THAT A FACT IS SUPPORTED BY TRUSTWORTHY EVIDENCE

### A.     The Proponent Of An Item Of Evidence Bears The Burden Of Authentication, And The Opposing Party May Raise Objections To The Proponent's Failure To Authenticate

"Authentication is a requirement that applies to all evidence offered as an exhibit at trial or as factual support for pretrial motions." Weinstein's Federal Evidence § 901.02[1]; *see United States v. Branch*, 970 F.2d 1368, 1370 (4th Cir. 1992) (noting that authentication is special aspect of relevance).

Under the Federal Rules of Evidence, the proponent of an item of evidence bears the burden of authentication.  "To satisfy the requirement of authenticating . . . , the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a); *see also* Fed. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."). When offering documentary evidence, the proponent owes to the court a "duty to identify the source of the documents and their absence of alteration."  *See Taylor v. Principi*, 141 F. App'x. 705, 708 (10th Cir. 2005).

If the proponent fails to discharge its duty, the Rules permit the opposing party to raise objections, which ensures that the court relies only on admissible evidence in finding facts.  *See, e.g.*, Fed. R. Civ. P. 56(c)(2) ("A party may object

3

that the material cited to support or dispute a fact cannot be presented in a form

that would be admissible in evidence.").

### B. Courts Have Recognized The Heightened Importance Of Authentication For Computerized Records

Computerized records present heightened authentication concerns because of

the "special characteristics of electronically stored records." *Lorraine v. Markel*

*Am. Ins. Co.*, 241 F.R.D. 534, 557 (D. Md. 2007).

> Computerized data . . . raise unique issues concerning accuracy and
> authenticity.  Accuracy may be impaired by incomplete data entry,
> mistakes in output instructions, programming errors, damage and
> contamination of storage media, power outages, and equipment
> malfunctions.  The integrity of data may also be compromised in the
> course of discovery by improper search and retrieval techniques, data
> conversion, or mishandling.  The proponent of computerized evidence
> has the burden of laying a proper foundation by establishing its
> accuracy.

Manual for Complex Litigation (Fourth) § 11.446 (2017).

Courts have recognized such heightened importance of authentication for

computerized records and routinely grant authentication objections.  *See, e.g.*,

*Lorraine*, 241 F.R.D. at 585 (denying summary judgment motion where the

exhibits were unauthenticated); *Rambus, Inc. v. Infineon Techs. AG*, 348 F. Supp.

2d 698, 707-08 (E.D. Va. 2004) (granting motion *in limine* to exclude certain

unauthenticated business records); *In re Vee Vinhnee*, 336 B.R. 437 (B.A.P. 9th

Cir. 2005) (finding no abuse of discretion in refusing to admit unauthenticated

business records); *see also Be-Lo Stores v. N.L.R.B.*, 126 F.3d 268, 279 (4th Cir.

4

1997) (administrative law judge erred in considering union authorization cards that had not been properly authenticated).

Similarly, the district court below recognized that the documentary evidence proffered by Appellee presented "special issues." J.A. 937. It observed that "[w]hen an electronic contract is at issue or one of the litigants is not a party to the contract, a litigant may not have a copy, the copy may not be physically signed, or both. Such circumstances may make it impossible for a litigant to know whether a particular copy actually reflects the terms accepted online. When an electronic record is in the exclusive control of one party to the contract, there are particular risks of fraud and mistake." *Id.*

## C. By Failing To Authenticate, The Proponent Multiplies Proceedings And Neglects The Court's Need For Trustworthy Evidence And Its Duty To Identify The Source And The Absence Of Alteration

In the face of authentication objections, the proponent of an item of evidence has several procedural devices at its disposal with which it can cure the authentication deficiency. For example, the proponent can show by a certification that the evidence is a record kept in the course of a regularly conducted activity. *See* Fed. R. Evid. 803(6), 902(11). With leave of court, depending on the procedural posture of the case, the proponent could also avail itself of discovery devices, such as serving the other party with a written request to admit "the genuineness of any described documents." Fed. R. Civ. P. 36(a)(1)(B). The party

5

served with such request would be subject to sanctions if it fails to admit the genuineness without "a reasonable ground to believe that it might prevail on the matter." Fed. R. Civ. P. 37(c)(2)(C).

A proponent's failure to utilize those procedural devices unnecessarily multiplies proceedings and neglects the court's need for trustworthy, authenticated evidence. *See* Lorraine, 241 F.R.D. at 542 ("[C]ounsel often fail to meet even this minimal [authentication] showing when attempting to introduce [electronically stored information], which underscores the need to pay careful attention to this requirement. Indeed, the inability to get evidence admitted because of a failure to authenticate it almost always is a self-inflicted injury which can be avoided by thoughtful advance preparation.").

Here, at no point before the district court's ruling on the motion to dismiss did the Appellee attempt to authenticate the documentary evidence that it had presented to the court in support of the motion.[4] The district court recognized this. *See* J.A. 199 ("No witness affirms that the documents were found in the business

---

[4] Appellee filed its motion to dismiss with unauthenticated evidence on November 8, 2013. J.A. 6, 121. After full briefing and a hearing, the district court denied the motion on March 10, 2014. J.A. 14, 196. On April 15, 2014, Appellee submitted an affidavit attempting to authenticate the evidence submitted earlier along with its renewed motion to dismiss. J.A. 15, 329.

records of the lender or otherwise establishes the authenticity of the documents.

The documents are not physically signed by Mr. Dillon, nor is there any sworn

testimony that the documents were presented to Mr. Dillon as part of the

underlying loan transaction or that Mr. Dillon electronically signed the agreements.

. . . [N]o defendant has offered any affidavit or other evidence as to how it came

into possession of the purported agreement.").  Only after the remand from this

Court did Appellee seek discovery.  J.A. 19, 437-438.

### D. The District Court Erred By Forcing The Objecting Party To Show Bases For Disputing Authenticity When The Proponent Presented No Proof Of Authenticity—In Direct Contradiction To The Burden Allocation Under The Federal Rules

In granting the motion for sanctions, the district court below erroneously

relied on dicta in *Fenje v. Feld* that "[e]ven if a party fails to authenticate a

document properly or to lay a proper foundation, the opposing party is not acting in

good faith in raising such an objection if the party nevertheless knows that the

document is authentic."  301 F. Supp. 2d 781, 789 (N.D. Ill. 2003), *aff'd*, 398

F.3d 620 (7th Cir. 2005); *see* J.A. 936.

The district court's ruling compels a party raising an authentication

objection to show good-faith bases for disputing authenticity even where the

proponent of the evidence has put forth no proof of authenticity.  As applied, an

objecting party that does not affirmatively demonstrate such good-faith bases risks

sanction under the district court's rule.  This is directly contrary to the burden

7

allocation established by the Federal Rules. *See supra* Parts I.A and I.B. The proponent of an item of evidence bears the burden of producing sufficient proof that the item is what it purports to be. When the proponent fails to produce such proof, the opposing party should be allowed to raise objections – including objections solely relating to the proponent's failure to carry its burden – without risking sanctions. Authentication objections ensure that the court relies on trustworthy evidence, particularly important in a case involving computerized records that were under exclusive control of the proponent. *See supra* Part I.C.

The district court misunderstood that *Fenje* was not a sanctions case but an evidentiary ruling; the court there was not making a finding of bad faith. 301 F. Supp. 2d at 788-790. *Fenje* involved extraordinary circumstances—discovery was particularly contentious, and both parties engaged in obstructive behavior. *Id.* at 788-789. The plaintiff in *Fenje* made a plethora of baseless evidentiary objections where the defendant had adequately authenticated the proffered documents with supporting affidavits or certifications. *See id.* at 789, 810. The court's dicta in *Fenje* should be read in this context.

The statement that "[e]ven if a party fails to authenticate a document properly or to lay a proper foundation, the opposing party is not acting in good faith in raising such an objection if the party nevertheless knows that the document is authentic" also does not apply here. *Id*. at 789. Appellants did not *know* that the

8

document in question was authentic—that it was the document that Appellants'
client clicked through at the time that he took out a loan.  Even though Appellants
were in possession of evidence tending to support the authenticity of the document
Appellee presented to the court, its authenticity was not established and certainly
not *known* to the counsel.

The two other sanctions cases on which the district court relied in its ruling
are also distinguishable.  *See* J.A. 936.  In *In re Interstate Steel Setters, Inc. v. A.J.
Maggio Co.*, the court sanctioned an attorney for objecting to the authenticity and
foundation of the documents that he himself had produced.  65 B.R. 312 (Bankr.
N.D. Ill. 1986).  The court's finding of bad faith was predicated upon the fact that
the attorney "knew all along that the documents were copies of authentic
documents of his client but simply forced Plaintiff to prove it by a cumbersome
and lengthy prove up.  He falsely represented to the Court all the while that he did
not know whether the documents were authentic or not."  *Id.* at 316.  In *Baulch v.
Johns*, the court sanctioned an attorney for making authentication objections to a
document on which the attorney's own expert witnesses relied and that the
attorney's other client had produced, leaving the attorney no reason to doubt the
document's accuracy.  70 F.3d 813, 817 (5th Cir. 1995).  Here, Appellants objected
to a document that was presented to the district court by Appellee for the first time
as an exhibit to a motion to dismiss without any supporting affidavit or

9

certification. It was not produced by Appellants; nor was it identical to the related document in Appellants' possession. *See* J.A. 125-130, 520-525, 920. The district court's reliance on *Interstate Steel Setters* and *Baulch* therefore was misplaced.

## II. COUNSEL HAS NO DUTY TO DISCLOSE ANY EVIDENCE WHEN MAKING AUTHENTICATION OBJECTIONS

### A. Authentication Objections Concern Only Whether The Proponent Made A *Prima Facie* Showing Of Authenticity, Not The Ultimate Authenticity Determination

The burden of authentication requires that the proponent make a *prima facie* showing that an item of evidence is what it purports to be. *See* Weinstein's Federal Evidence § 901.02[3]; *United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009). Once the proponent makes the requisite showing, the proffered item of evidence is authenticated and admitted (*i.e.*, it can be considered by the factfinder), unless other grounds for inadmissibility apply. However, authentication does not mean that the authenticity of the admitted evidence is established—the opposing party can later introduce other evidence that tends to disprove the authenticity. *See Vidacak*, 553 F.3d at 350 ("[T]he burden of authentication is not as demanding as suggested by Vidacak—a proponent need not establish a perfect chain of custody . . . ."). The existence of other evidence that may undermine the authenticity of admitted evidence "go[es] to the weight of the evidence instead of its admissibility." Weinstein § 901.02[3].

10

In applying those principles, when a party makes an objection to a proponent's failure to authenticate, the objecting party is contesting the admissibility of the proffered item of evidence, not its ultimate authenticity. The objecting party has no affirmative duty to disclose any evidence, regardless of whether it tends to prove or disprove authenticity. Authentication objections are about what the *proponent* should have done, not the objecting party. *See* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating . . . , the *proponent* must produce evidence sufficient to support a finding that the item is what the proponent claims it is." (emphasis added)).

### B. The Disclosure Rule Imposed By The District Court Has No Basis And Will Flood The Court System With Prophylactically Appended Evidence, Adversely Affecting Pretrial Motions Practice

In granting the motion for sanctions, the district court below found that Appellants acted in bad faith and violated their duty of candor, in part because they failed to disclose "unfavorable and potentially dispositive evidence" to the factfinder. *See* J.A. 957-958. The district court's ruling creates an ambiguous disclosure rule that compels parties to disclose certain evidence when making authentication objections. Such disclosure rule has no basis in case law, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, or the North Carolina Rules of Professional Conduct.

11

If other courts were to adopt the disclosure rule announced by the district court, it could have serious adverse consequences on litigation practice in the federal courts. This risk stems from the fact that the district court's rule is entirely unmoored from any of the existing rules of evidence or civil procedure that practitioners rely on to understand their burdens and guide their behavior. As put forth in the district court's ruling, an attorney who failed to propound unfavorable evidence when filing a pre-discovery motion would risk sanction. The inevitable flood of prophylactically appended evidence will burden the court system's limited resources while providing little or no practical value to the judge in deciding the motions at issue. It would also dramatically alter the normal flow of civil litigation, effectively moving substantial portions of the discovery process into Rule 12 proceedings.

The somewhat vague requirement that the moving party disclose "unfavorable and potentially dispositive evidence," J.A. 958, in addition to providing limited substantive guidance, establishes no boundaries to the applicability of this new disclosure requirement. On its face, the district court's rule is not even limited to pre-discovery motions. Even if so limited, the same rationale could easily be applied to other common pre-discovery motions such as objections to venue, requests for remand, and, most critically, motions to dismiss.

12

Motions to dismiss for failure to state a claim are a fixture in federal practice – more than one in every twenty cases includes such a motion in the post-*Twombly/Iqbal* era.[5]  The upshot of this practice is that district court judges see an enormous number of these motions each year.  If each of these motions – which, like an objection for failure to authenticate, challenges the sufficiency of an adversary's prima facie showing – is suddenly weighed down by an anchor of potentially adverse evidence, not only will judicial resources be taxed,[6] but the efficiency of Rule 12(b)(6) motions to dispose of unmeritorious claims will also be diminished.  This potential impediment to judicial efficiency envisioned by the

---

[5]  In 2011, the Federal Judicial Center embarked on a study to determine the effect of *Twombly* and *Iqbal* on the filing and granting of motions to dismiss for failure to state a claim.  It found that, in the post *Twombly/Iqbal* era, 6.2% of cases involved a motion to dismiss under Rule 12(b)(6).  S*ee, e.g.,* Lonny Hoffman, *Twombly and Iqbal's Measure: An Assessment of the Fed. Judicial Ctr.'s Study of Motions to Dismiss*, 6 Fed. Cts. L. Rev. 1, 11 (2011); Joe S. Cecil, et al., *Motions to Dismiss for Failure to State a Claim After Iqbal – Report to the Judicial Conference Advisory Comm. on Civil Rules*, Fed. Judicial Ctr. (2011).

[6] Indeed, this rule, by promoting the inclusion of large amounts of potentially (though not necessarily) relevant evidence runs counter to the general policy of preserving judicial resources by keeping the court from having to sift through a mountain of documents to reach their conclusion.  *See, e.g.*, *Schwartz v. I.R.S.*, 511 F.2d 1303, 1306 (D.C. Cir. 1975) (explaining, in the context of limitations to FOIA actions, that certain rules had been imposed "to relieve the intolerable burden that would otherwise be imposed on the courts, particularly where large quantities of documents would have to be scrutinized").

Federal Rules outweighs any benefit that might be gained by allowing the district court's new disclosure rule to stand.

## III.  THE RULES IMPOSED BY THE DISTRICT COURT WILL CHILL ZEALOUS ADVOCACY AND UNDERMINE THE ADVERSARIAL SYSTEM

The district court's approach to sanctions discourages zealous advocacy and risks damaging federal litigation practice by diminishing the adversary system. Such a result would be highly problematic, given that the adversary system lies at the heart of our jurisprudential approach.  *See* Monroe H. Freedman, *Our Constitutionalized Adversary System*, 1 Chap. L. Rev. 57 (1998) ("[T]he phrase 'adversary system' is synonymous with the American system for the administration of justice—a system that was constitutionalized by the Framers and that has been elaborated by the Supreme Court for two centuries.  Thus, the adversary system represents far more than a simple model for resolving disputes. Rather, it consists of a core of basic rights that recognize and protect the dignity of the individual in a free society.").  Part and parcel of that system is the notion that justice is best served when two advocates, taking adverse positions, fight zealously for their clients' positions.

14

A.    **The District Court Asks Advocates To Advance Their Adversaries' Case By Disclosing Unfavorable Evidence**

Because federal courts – and indeed nearly all American courts[7] – rely on the adversary system, the rules that guide practice rarely insist that one advocate proactively advance his or her opponent's position.  Indeed, such an approach would run contrary to the ethos of the adversary system.  *See* Philip Shuchman, *The Question of Lawyers' Deceit*, 53 Conn. B.J. 101, 124-25 (1979) ("The lawyer, however, owes no duty to his adversary that rises as a high as his duty to his client.").  The only procedural or ethical rule that actually demands an advocate affirmatively and proactively improve his opponent's standing in a case is Rule 26(a) of the Federal Rules of Civil Procedure, which delineates "required disclosures" by each party.  And the passage of that rule was not without controversy – Justice Antonin Scalia opposed the amendment of the rules to include such required disclosures on grounds that the new rule "d[id] not fit comfortably within the [adversarial] American judicial system."  *See* Committee

---

[7] While some specialty courts do embrace a non-adversarial approach to seeking resolution, these are marked exceptions from traditional civil and criminal courts in the United States.

15

Notes on Amendments to Federal Rules of Civil Procedure, 146 F.R.D. 401 (1993) (Scalia, J., dissenting).[8]

Justice Scalia may well be correct that Rule 26(a) is inconsistent with the adversary system, but that rule at least provides specific metes and bounds to make clear what must be disclosed. By listing precisely the information that the attorney must provide to his adversary, the advocate can be sure of the scope of his obligations and, having fulfilled them, be sure that he will not face the court's ire. Moreover, the Rule 26(a) disclosures have the merit of being balanced. Although an advocate may prefer not to proactively disclose all of the required information without being asked, he can at least rest assured that his opponent will do the same. The disclosure rule imposed by the district court provides no such balance. Instead, it would place the lawyer considering a pre-discovery motion in a precarious position, weighing the value of the motion against the potential damage if his proactive disclosures reveal information that opposing counsel may fail to

---

[8] Justice Scalia's dissent rails against the new rule, asserting that: "[t]he proposed new regime does not fit comfortably within the American judicial system, which relies on adversarial litigation to develop the facts before a neutral decision maker. By placing upon lawyers the obligation to disclose information damaging to their clients—on their own initiative, and in a context where the lines between what must be disclosed and what need not be disclosed are not clear but require the exercise of considerable judgment—the new Rule would place intolerable strain upon lawyers' ethical duty to represent their clients and not to assist the opposing side." 146 F.R.D. at 511.

16

ask for if the case reached the discovery phase.  We should not ask lawyers to do

such weighing; nor is such a task fitting of an attorney.  As Professor Albert

Alschuler observed, "[o]nce lawyers [are] as loyal to opposing parties … as they

[are] to their clients, however, their clients would no longer have lawyers.  The

clients would have only judges – a whole series of them."  Albert Alschuler, *The*

*Search for Truth Continued, the Privilege Retained: A Response to Judge Frankel*,

54 U. Colo. L. Rev. 67, 72 (1982).

### B.    The District Court's Liberal Imposition Of Sanctions Discourages Zealous Advocacy

Beyond its inconsistency with the adversary system, the district court's

ruling, and especially its liberal embrace of sanctions, threatens the adversary

system itself by potentially chilling zealous advocacy, including simply demanding

that the party with the burden of production or proof actually fulfill that burden.

As Professor Uelmen noted, "[t]he premise of the adversary system is that the goal

of fair adjudication is more likely to be served if lawyers function as zealous

advocates for their clients."  Gerald F. Uelmen, *Lord Brougham's Bromide: Good*

*Lawyers as Bad Citizens*, 30 Loy. L. A. L. Rev. 119 (1996).  The lawyer's

obligation to zealously advocate for her client is a core ethical principle in legal

17

ethics.[9]  *See* Model Rules of Prof'l Conduct, Preamble 2 (Am. Bar. Ass'n 2013)

("As advocate, a lawyer zealously asserts the client's position under the rules of

the adversary system.").

The duty of zealous advocacy is not only a fundamental ethical principle, but

also the central force that guides practitioners.  *See* Peter J. Henning, *Lawyers,*

*Truth, and Honesty in Representing Clients*, 20 Notre Dame J.L. Ethics & Pub.

Pol'y 209, 219 (2006) ("When lawyers stand up in the courtroom, the devotion to

client's interests – the zealous advocate – is the principle feature of the proceeding.

The lawyer acts as the 'champion' of the client's interests, limited only by the rules

that prevent a lawyer from using false evidence or perjurious testimony.")  Indeed,

one of the most famous quips in legal history describes the sanctity of the lawyer's

role as a zealous advocate.  Lord Brougham, defending Queen Caroline in 1820,

asserted that "an advocate, in the discharge of his duty, knows but one person in all

the world, and that person is his client.  To save that client by all means and

---

[9] Indeed, this duty can be found in the 1908 Canons of Professional Ethics,
the American Bar Association's first publication of its kind.  *See Final Report of*
*the Comm. on Code of Prof'l Ethics*, 31 Annu. Rep. A.B.A. 567, 586 (1908) ("The
lawyer owes 'entire devotion to the interest of the client, warm zeal in the
maintenance and defense of his rights and the exertion of his utmost learning and
ability' to the end that nothing be taken or withheld from him, save by the rules of
law, legally applied.").

expedients, and at all hazards and costs to other persons, and, amongst them, to himself, is his first and only duty." 2 *Trial of Queen Caroline* 8 (London, J. Robins & Co. Albion Press 1820-21), *quoted in* Uelmen, 30 Loy. L. A. L. Rev. at 120.

If lawyers are to advocate zealously, as the rules of ethics require and as the adversary system demands, they must be free to make every reasonable and supportable argument that might advance their clients' position, even if they believe it is likely to fail.[10]  This is not to say that they must *make* every argument, of course, but they must always be free to make all non-frivolous arguments.  *See* Henry J. Friendly, *"Some Kind of Hearing"*, 123 U. Pa. L. Rev. 1267, 1288 (1975) ("Under our adversary system the role of counsel is not to make sure the truth is ascertained but to advance his client's cause by any ethical means.  Within the limits of professional propriety, causing delay and sowing confusion not only are his right but may be his duty.").  Attorneys will often be aware of evidence that

_____

[10] The counsel sanctioned in this case likely did not think that their authentication objection would fail – indeed the court credited the argument.  That the district court sanctioned counsel for advancing an argument that the court had initially credited shows how pernicious the effects of the district court's ruling would be if it is affirmed.  If lawyers can be sanctioned for advancing arguments credited by the court, they will surely be both circumspect in raising arguments and emboldened to file sanctions motions.

would diminish an argument or a legal precedent that cuts against that argument, but that does not mean that the position cannot prevail. The Model Rules, and the long history of zealous advocacy under the common law, suggest that an ethical lawyer should propound an argument that may fail, provided there is even a miniscule possibility that the argument will further the client's legal position. *See* Monroe H. Freedman, Understanding Lawyers' Ethics, 79-80 (1990) ("[I]f the advocate has doubts about the bounds of the law, she should resolve them in favor of the client's interests. Thus, a lawyer contemplating a novel legal argument, or even one that has been rejected by the court in a previous litigation, can nevertheless act ethically in presenting that argument despite her own professional opinion that the argument will be rejected."); *see also* Fred C. Zacharias, *Reconciling Professionalism and Client Interests*, 36 Wm. & Mary L. Rev. 1303, 1338 (1995) ("The [Model Rules' Code of Ethics] start with a premise of zeal. Although stating that lawyers need not 'press for every advantage,' the clear implication of the codes is that lawyers should maximize client interests.").

The district court's approach dissuades practitioners from fulfilling their obligation to zealously pursue every potentially winning argument. As Professor Freedman explained, "one of the most serious threats to zealous advocacy" is the "impos[ition of] sanctions against lawyers who file pleadings or make arguments that the court finds unavailing." Freedman, Understanding Lawyers' Ethics, 77-

20

78.  The late Judge Weinfeld of the Southern District of New York also recognized

that risk.  In *Colucci v. New York Times Co.*, he found that the "plaintiff's alleged

claims were without a reasonable basis in fact" and taxed the plaintiff $1,500 in

attorney's fees as a result.  533 F. Supp. 1011, 1012 (S.D.N.Y. 1982).  Yet Judge

Weinfeld there declined to assess against the plaintiff's attorney a portion of those

fees pursuant to 28 U.S.C. § 1927, in part due to the risk of undermining advocacy.

*Id.* at 1013.  He concluded that "[t]he sanctions authorized under section 1927 are

not to be lightly imposed; nor are they to be triggered because a lawyer vigorously

and zealously presses his client's interests.  The power to assess the fees against an

attorney should be exercised with restraint lest the prospect thereof chill the ardor

of proper and forceful advocacy on behalf of his client."  *Id*. at 1013-1014.

### C.    The District Court's Sanction Rule Creates Conflict Between Counsels' Interests And Their Clients'

The overuse of sanctions against attorneys acting in their clients' interest

risks creating a conflict between the attorney's interest and the client's.  As

discussed *supra*, the client's interest will be in having his lawyer pursue any

argument that could potentially improve his legal position.  And, of course, it is the

lawyer's obligation to zealously pursue that interest.  However, if the pursuit of a

particular argument that could advance the client's interest also puts the attorney at

21

risk for sanctions,[11] the attorney will be forced to decide between her own interests and the client's.  In theory, "[w]hen the client's interest and the professional's interest conflict, the professional is to forgo his interest in favor of the client's." Stephen L. Pepper, *The Lawyer's Amoral Ethical Role: A Defense, A Problem, and Some Possibilities*, 1986 Am. B. Found. Res. J. 613, 616 (1986).

However, many attorneys will likely find it challenging, if not impossible, to risk sanction by the court in order to pursue borderline arguments in service of their client's ends.  This is doubly true when sanctions have effects beyond the monetary.  Courts have the authority to impose non-monetary sanctions on attorneys – precluding them from practicing law for a certain period of time.  *See* Bruce A. Green, *Whose Rules of Prof'l Conduct Should Govern Lawyers in Fed. Court and How Should the Rules Be Created?,* 64 Geo. Wash. L. Rev. 460, 462 n.7 (1995-1996) ("[F]ederal courts … supervise and discipline lawyers pursuant to inherent judicial authority to admit, suspend and disbar lawyers who practice

---

[11] As with many legal issues, this problem will be most pressing in marginal situations.  For example, consider a situation where an attorney believes that a particular potential motion has a low chance of success (*e.g.*, because it requires a judge to reverse existing precedent) but knows that winning the motion would resolve the case in the client's favor.  The client will have a strong interest in the attorney pursuing the motion, but the attorney may have serious misgivings if courts begin regularly imposing sanctions against attorneys for propounding arguments the court found unpersuasive.

22

within the jurisdiction of the court.") (internal quotation marks omitted).  Further, the imposition of sanctions against an attorney undermines that attorney's ability to be appointed by courts to other counsel positions, including class counsel.

Such sanctions, which deprive the lawyers of their livelihood, would give any rational person pause.  Expecting a person, even a professional, to be able to charge ahead in pursuit of the client's interests while risking substantial damage to his or her own livelihood strains credulity.

Fellow academics have recognized that lawyers may fail to place clients' interests above their own when potential consequences for the lawyer are severe. For example, Professor Zacharias wrote that "[u]nder Thurman Arnold's encapsulation of legal ethics – 'if it comes down to whether he goes to jail or his client does, he'll make sure it's his client' – a lawyer will demur when helping a client achieve wrongful ends might subject the lawyer to criminal or civil liability." 36 Wm. & Mary L. Rev. at 1346.  This assertion is even more likely to be true when the client's ends are not even "wrongful," but may be only quarrelsome, questionable, or dilatory.  Professor Fails noted the same problematic clash of incentives where lawyers risk their ability to practice by pursuing client's interests to the furthest.  Explaining the risk presented by overuse of obstruction-of-justice prosecutions against attorneys under the Sarbanes-Oxley Act, she observed that "lawyers will be disincentivized to fight for their clients when their careers and

23

livelihoods could be jeopardized" and concluded that such an environment would "result[] in overdeterrence of legitimate advocacy."  Greta Fails, *The Boundary Between Zealous Advocacy and Obstruction of Justice After Sarbanes-Oxley*, 68 N.Y.U. Ann. Surv. of Am. L. 397, 399 (2012-2013).

The district court in this case announced a rule that dissuades zealous advocacy by threatening sanctions against litigators who force their opponents to meet their authentication burden.  However, the effect of the district court's willingness to chill zealous advocacy through overly liberal imposition of sanctions could have far broader consequences, "jeopardiz[ing] … [t]he genius of our common law."  Freedman, Understanding Lawyers' Ethics, 78.  The development of the common law can only proceed when lawyers, acting in service of their client's end, challenge judge-made rules and applications of the law.  This includes, at times, objecting to long-held and well-established rules and interpretations.  If lawyers are strongly deterred from bringing such challenges due to the threat of sanctions, the development of the common law could stagnate, thereby undermining the judicial system.

## IV.  THE RULES IMPOSED BY THE DISTRICT COURT WILL INVITE ABUSIVE AND FRIVOLOUS SANCTIONS MOTIONS THAT WILL FURTHER BURDEN THE COURTS

Finally, the district court's liberal approach to sanctions will spawn a new avenue for abusive and frivolous sanctions motions by encouraging litigators to

move for sanctions whenever they conclude that their opponent failed to

proactively disclose adverse evidence in a pre-discovery motion.  Such a result

would of course be ironic – the availability of sanctions is supposed to deter parties

from engaging in, for example, abusive discovery behavior requiring the

intervention of the court – but it would not be surprising.  Both academics and

practitioners have noted that when a court responds favorably to sanctions motions,

litigators will be encouraged to file such motions to gain the upper hand on their

adversaries.  *See, e.g.*, Byron C. Keeling, *A Prescription for Healing the Crisis in

Professionalism: Shifting the Burden of Enforcing Prof'l Standards of Conduct*, 25

Tex. Tech L. Rev. 31, 46 (1993-1994) ("Rather than controlling abuses, in several

instances sanctions provisions have served to spawn abuses."); C. William Phillips,

*The Law and Tactics of Sanctions*, 87 C.P.S. A-87, A-89 (2007) ("Thus

encouragement of sanctions litigation tended to undercut the very goals that the

availability of sanctions was intended to achieve: streamlining litigation and court

dockets and penalizing frivolous litigation.  Instead, valuable court resources were

used sorting through satellite sanctions litigation.").

The adverse effects of liberal sanctions motions are illustrated by the use of

motions under Rule 11 of the Federal Rules of Civil Procedure before it was

overhauled in 1993.  Although intended to provide a check on frivolous filings,

district courts' receptivity to Rule 11 sanctions motions opened the door to

litigators' abuse of such motions for tactical purposes.  Professor Keeling noted that "hardball litigators practicing in federal court … learned to deflect attention from their own actions with repeated motions for Rule 11 sanctions against opposing counsel."  Keeling at 47-48.  Professor Keeling described several tactical functions for Rule 11 motions such as casting opposing counsel as more manipulative than the litigator seeking sanctions, stalling pre-trial proceedings while the Rule 11 motion is pending, influencing the judge's feeling on the merits, and giving the moving party an opportunity to recover some fees.  *Id.*

The tactical use of Rule 11 sanctions motions did not escape the notice of the judiciary.  In 1987, a Third Circuit panel decried that "[t]he use of Rule 11 as an additional tactic of intimidation and harassment has become part of the so-called 'hardball' litigation techniques espoused by some firm and their clients."  *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 485 (3d Cir. 1987).  Although the panel warned that it was "far from enchanted with such abusive conduct," the practice continued unabated until the Rules were amended six years later.  *Id.*; *see also Dondi Prop. Corp. v. Commerce Sav. and Loan Ass'n*, 121 F.R.D. 284, 286 (N.D. Tex. 1988) (en banc) (noting, in a case involving numerous cross-motions for sanctions that "[w]ith alarming frequency … [j]udges and magistrates of this court are required to devote substantial attention to refereeing abusive litigation tactics that range from benign incivility to outright obstruction.").

26

The tactical use of Rule 11 motions became so common place in the 1980s and early 1990s in part because the language of the rule itself was vague and the case law surrounding it ambiguous. Beyond the scope of Rule 11, vagaries of statutes and rules governing sanctions motions tend to encourage vexatious motions practice. In another example highlighted by Professor Keeling, a vaguely phrased provision of a Texas state procedure requiring disclosure of expert witness information "as soon as is practical" has spawned regular and abusive sanctions litigation. *See* Keeling at 65. Because the phrasing of the rule is vague, litigators can claim a good faith basis for moving for sanctions, almost irrespective of when their opponents make the actual disclosure. Even if such motions are unlikely to succeed, the moving party can gain a tactical advantage by injecting additional motions practice into the proceedings and having at least an outside chance of preventing an otherwise qualified expert witness from testifying.

The same vague language that precipitated the abusive motions practice in the examples above is present in the district court's sanction ruling below. It stands to reason that the same result will follow. Aggressive litigators will seize on the vagueness of the district court's ruling, cite it routinely, and begin using sanctions motions as a cudgel to intimidate opponents and delay proceedings at every opportunity. "[T]he imposition of judicial sanctions is an expensive and time-consuming process…" and in an era of already strained judicial resources,

27

"[s]anctions motions, and subsequent sanctions hearings, make matters even worse."  Keeling at 45.  If the district court's ruling is allowed to stand, this drain on judicial resources is not just possible, but likely.

## CONCLUSION

The district court's judgment should be vacated.

Respectfully submitted,

 /s/ *David C. Frederick*
David C. Frederick
Minsuk Han
Jacob E. Hartman
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (facsimile)
dfrederick@kellogghansen.com

*Counsel for Law Professors as Amici Curiae*

July 19, 2017

# APPENDIX

## List of *Amici Curiae*

**Stephen L. Braga** is a Professor of Law, Director of the Appellate Litigation Clinic, and Director of Clinical Programs at the University of Virginia School of Law.  He teaches professional responsibility, evidence, and civil litigation.

**David Gray** is a Professor of Law at the Francis King Carey School of Law at the University of Maryland.  He teaches evidence and criminal law.

**Carissa Byrne Hessick** is the Anne Shea Ransdell and William Garland "Buck" Ransdell, Jr. Distinguished Professor of Law at the University of North Carolina School of Law. She teaches professional responsibility.

**F. Andrew Hessick** is a Professor of Law at the University of North Carolina School of Law.  He teaches evidence and civil procedure.

**Colin Miller** is a Professor and Associate Dean for Faculty Development at the University of South Carolina School of Law.  He teaches evidence, civil procedure, and criminal law and procedure.

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rules of Appellate Procedure 29(c)(7) and 32(a)(7)(C), I certify that this brief complies with the applicable type-volume limitations.  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), this brief contains 6,490 words.  This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word 2007) used to prepare the text of this brief.

I further certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

## CERTIFICATE OF SERVICE

I hereby certify that, on July 19, 2017, I electronically filed the foregoing

BRIEF OF LAW PROFESSORS AS *AMICI CURIAE* with the Clerk of the Court

for the United States Court of Appeals for the Fourth Circuit by using the appellate

CM/ECF system. All participants are registered CM/ECF users and will be served

by the appellate CM/ECF system.


 /s/ *David C. Frederick*
David C. Frederick